UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JESSY JOE ROTEN,

               Petitioner,

v.                               Case No. 8:05-cv-374-T-24MSS

SECRETARY, DEPARTMENT OF
CORRECTIONS,

               Respondent.

_____

O R D E R

      This cause is before the Court on Petitioner Jessy Joe Roten's 28 U.S.C. § 2254 petition for writ of habeas corpus.  Roten is proceeding on his amended petition (Doc. No. 4). Roten challenges his conviction and sentence entered by the Circuit Court for the Sixth Judicial Circuit, Pinellas County, Florida.  Respondent filed a response (Doc. No. 17) and Roten filed a reply and an amendment to the reply (Doc. Nos. 19, 21).  A review of the record and the filings demonstrate that, for the following reasons, Roten's petition must be **DENIED**.

BACKGROUND

      On April 22, 1999, in Case No. CRC99-07223CFANO, Roten was charged by Grand Jury indictment with one count of Second Degree Murder, and two counts of Attempted Second Degree Murder. (Vol. I: R 1-4).[1]  In each count, the indictment charged that Roten used a semi-automatic firearm and its high capacity detachable box magazine, and that he evidenced prejudice based on the race, color or ethnicity of the victims.

_____

[1] Respondent filed the record on appeal as Exhibit 19.The record consists of fourteen original volumes (Vol. 1-14), plus six supplemental volumes (Supp. Vol. 1-6).  The trial transcript is contained in original volumes 5-14, and is referred to by volume number followed by the page number located in the upper right hand corner of the page.

A jury trial began October 17, 2000. Roten was represented by private counsel. On October 26, 2000, the jury found Roten guilty as charged. (Vol. 3: R 366-368)  On October 26, 2000, the state trial court adjudicated Roten guilty of second degree murder and two counts of attempted second degree murder. (Vol. 3: R 371-372)  On November 30, 2000, the court reclassified both attempted second degree murder convictions to first degree felonies for use of a firearm, pursuant to section 775.087, Florida Statutes, and then to life felonies, pursuant to the Hate Crime Statute, section 775.085, Florida Statutes. The state trial court sentenced Roten to life imprisonment on all three counts, with the sentences to be served concurrently. (Vol. 3: R 637-641; Supp. Vol. 6: R 1293-1297, 1318-1319)

TRIAL EVIDENCE

On April 3, 1999, a bullet entered a bedroom of the Mance family, where three young sisters and a half-sister were sleeping in the same bed. The bullet shot both Ashley and Aleesha Mance, six-year-old twins, in their shoulders. Ashley died at the home, and Aleesha was seriously wounded. (Vol. 5: T 71, 86, 87, 88-89)  The bullet also slightly injured the ear of the half-sister, Jailene Jones. (Vol. 5: T 114) Terry Mance, the father of Ashley and Aleesha, testified that at 2:30 a.m., he heard a series of six or seven shots and then a series of six or seven more. The shots sounded as if they came from his backyard. At 4:30 a.m., Mr. Mance heard what sounded like two more gunshots and then heard the girls screaming. (Vol. 5: T 69). He called 911 after he saw that his daughters were injured. (Vol. 5: T 86)

Mr. Mance testified regarding an incident that occurred on Halloween, six months prior to the shooting. He testified that he was in a confrontation with four white males walking through the alley behind his house. (Vol. 5: T 125) The men looked like Skinheads because of their haircuts and the way they were dressed. (Vol. 5: T 125, 126) One of the men cursed at Mr. Mance and his brother and called them "monkey." (Vol. 5: T 125) Later, Mr. Mance recognized that man to be Roten. (Vol. 5: T 131)

Aldi Sanders was a neighbor who heard shots on the night in question. (Vol. 5: T 191)  She heard a series of shots and one shot at 2:30 a.m. (Vol. 5: T 193) She then saw a person with a rifle in the alley. (Vol. 5: T 194)  After hearing a single shot at 4:30 a.m., Ms. Sanders saw a person running.  That person had on clothing different from that of the person with the rifle she had seen earlier. (Vol. 5: T 198)

As to the first shooting, it was 2:30 a.m. when Deputy Somers happened to be in the area on an unrelated offense when he heard four rounds of shots. As he ran in the direction of the shots, he heard four more rounds, a pause, then a single shot. (Vol. 6: T 212-213). Officers investigated the area, found several shell casings in the alley near the victims' home, but could not locate a suspect. (Vol. 6: T 219).

At approximately 4:30 a.m., the second shooting occurred. Like neighbor Aldi Sanders (Vol. 5: T 198, 201), three other neighbors, Joyce Bierl, Elizabeth Mercado, and Noreen Smith told police they heard a single shot at that time. (Vol. 6: T 208, 240; Vol. 9: T 825, 843)

After the fatal shooting and 911 call from Mr. Mance at 4:30 a.m., officers arrived at the scene and began their investigation. A police dog led the officers to the house where Roten resided, approximately nine houses away from the victims' residence. Roten came out from behind his house, and the officers asked him to come with them to the police station for an interview. Roten volunteered to do so. (Vol. 6: T 306)

In the first interview,[2] Roten told officers that he was at a friend's house on the night in question. (Vol. 6: T 395)  He said that he did not return home until 4:45 a.m., and when he arrived at his home, he saw police. (Vol. 6: T 397)  He explained each of his tattoos for police and told them that he belonged to a group called SHARP, an acronym for Skinheads Against Racial Prejudice. (Vol. 7: T 402-405, 409, 411, 413)  He stated that the group does

---

[2] The edited versions of the audiotaped interviews were published to the jury at trial. The transcript of the first interview is located at Vol. 6: T 377 to Vol. 7: T 439. The second interview is located at Vol. 7: T 479-526.

not have a Nazi affiliation. (Vol. 7: T 405)  Roten denied any confrontation with Blacks in his neighborhood and denied having a weapon in his home. (Vol. 7: T 420) Roten knew that an interracial couple lived in the Mance house and that there were little girls of mixed race in the home. (Vol. 419-420)

Roten, his girlfriend, and his parents consented to a search of Roten's residence. (Vol. 7: T 447, 448)  Police searched Roten's room and found a bullet matching the casings found in the alleyway. (Vol. 7: T 454) Also, police found numerous items of racist/Nazi/white supremacy paraphernalia. (Vol. 3: R 424-429).  Roten's wallet contained a card that read "White people awake. Save the white race." (Vol. 7: T 558). Police found a rifle in a garbage bag inside the garage.  The rifle was determined to be the murder weapon. They also found clothes and a bomber jacket full of ammunition in a bag. (Vol. 6: T 461) The detectives discovered that Roten had scrawled on the back of his bedroom door, "Someone had to - for Race and Nation - Jessy Roten, to all my brothers, see you in Valhalla." Two witnesses who were in Roten's room on a daily basis indicated the message was not on the door prior to the shooting. (Vol. 8: T 728, 729-730; Vol. 9: T 885-887)

After reading Roten his <u>Miranda</u> rights, police took Roten back to the police station for a second interview. (Vol. 6: T 456) At his second interview, Roten admitted that he was not a member of SHARP. (Vol. 6: T 456) Roten said he had a fight with his friend Todd and with his girlfriend, Dana Molina, on the night in question. (Vol. 7: T 486) He was angry and a friend drove him back to his house. (Vol. 7: T 490) Roten admitted that he grabbed his gun and went into the alley about 2:30 a.m. (Vol. 7: T 492) Roten said he shot five rounds, went back home for a few minutes, then went out to the alley again and shot more rounds. (Vol. 7: T 493)

Roten said that later, about 4:30 a.m., he went back into the alley and began shooting more rounds into the air. He told the detectives that he shot into the victims' house accidentally because he tried to fold the rifle stock with his chin and the rifle discharged.

(Vol. 7: T 497, 500) Roten stated that he heard a girl scream  and he ran back to his house. (Vol. 7: T 502) Although he knew the shot went into the victims' house, Roten told officers that he did not mean to shoot into the house. (Vol. 7: T 502) Evidence showed that Roten changed his clothes before going back into the alley at 4:30 a.m. He put on camouflage army fatigues and a black bomber jacket. (Vol. 7: T 528-529)

George Harvell, a friend of Roten, testified that he sold the firearm to Roten for $300. (Vol. 8: T 706) Harvell knew that Roten was under the age of eighteen when he sold Roten the firearm. (Vol. 8: T 706) Harvell was with Roten on the night in question. (Vol. 8: T 708) He knew Roten was mad at a friend and at his girlfriend. (Vol. 8: T 713, 714) Harvell also knew that Roten fired shots at 2:30 a.m. (Vol. 8: T 724)

Roten's mother, Katherine Wooley, testified for the State. She told the jury that Roten called her later on the day after the victims were shot and told her to "get rid of" his bomber jacket. (Vol. 9: T 801, 802) Ms. Wooley complied and removed the patches from the jacket and placed the jacket in a garbage bag. (Vol. 9: T 804) The patches related to white supremacist groups. (Vol. 9: T 803) Roten told his mother about shooting his gun. He claimed that the last shot that struck the victims came out of the gun while his gun was pointed down. (Vol. 9: T 809)

John Mauro, the supervisor for the forensic sciences section, testified regarding the 12 casings recovered from the scene of the crime. (Vol. 10: T 1074) He described the location of each casing. (Vol. 10: T 1080-1082) He also testified that the bullet hole from the ground up was three feet six inches. (Vol. 10: T 1105) Mr. Mauro used a laser trajectory to trace and document the bullet trajectory. (Vol. 10: T 1105)

PROCEDURAL BACKGROUND

Roten pursued a direct appeal, raising two issues:

ISSUE I: THE INTRODUCTION OF A 911 CALL TAPE RECORDING AND AN ENLARGED PHOTOGRAPH OF THE DECEASED VICTIM REQUIRE REVERSAL OF MR. ROTEN'S CONVICTION.

ISSUE II: THE STATE'S IMPROPER COMMENT DURING CLOSING
REQUIRES REVERSAL OF MR. ROTEN'S CONVICTION.

On June 12, 2002, in Case No. 2D00-5487, the state district court of appeal per curiam affirmed the conviction and sentence. (Exhibit 5). <u>Roten v. State</u>, 821 So. 2d 1069 (Fla. 2d DCA 2002)[Table]. Roten filed a pro se motion for rehearing which was not received by the state district court of appeal until after the mandate had issued. (Exhibit 7). The state district court of appeal denied the motion for rehearing on August 21, 2002. (Exhibit 8).

### Rule 3.850 Motion for Postconviction Relief

On January 23, 2003, Roten filed a pro se Motion for Postconviction Relief and memorandum of law pursuant to Fla. R. Crim. P. 3.850. (Exhibit 9). He raised twenty-four allegations of ineffective assistance of trial counsel. Roten filed an amendment to the memorandum of law in May 2003, an amended memorandum of law in June 2003, and notice of supplemental authority in July 2003. (Composite Exhibit 10).  On March 25, 2004, the state trial court summarily denied all claims. (Exhibit 11). The state trial court analyzed the claims under the two-prong test set out in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and attached relevant portions of the record to the order. Roten, pro se, filed a motion for rehearing (Exhibit 12), which the state trial court denied on April 15, 2004. (Exhibit 13). Roten appealed the order denying postconviction relief. (Exhibit 14).  On August 25, 2004, in Case No. 2D04-1989, the state district court of appeal per curiam affirmed the denial of rule 3.850 relief. (Exhibit 16) The mandate issued on September 23, 2004. (See Exhibit 15)

### State Habeas Corpus Petition

On September 7, 2004, Roten filed a petition for writ of habeas corpus in the state district court of appeal alleging ineffective assistance of appellate counsel. (Exhibit 17) Roten complained that his appellate counsel was ineffective for declining to challenge on direct appeal the detective's testimonial comment on Roten's right to remain silent. On

November 1, 2004, in case No. 2D04-4061, the state district court of appeal dismissed the petition for writ of habeas corpus as untimely. (Exhibit 18). Roter [sic] v. State, 888 So. 2d 639 (Fla. 2d DCA 2004).

## THE PRESENT PETITION

The original federal petition was timely signed by Roten on February 23, 2005. He filed an amended petition on March 17, 2005, raising five claims of ineffective assistance of trial counsel and one claim of prosecutorial misconduct: (1) counsel was ineffective for failing to call Stephanie Query as an exculpatory witness; (2) counsel was ineffective for failing to subpoena Heath Query, an exculpatory witness; (3) counsel was ineffective for failing to move to strike the State's allegations that Roten had committed a "hate crime," based on the State's failure to prove an essential element of a hate crime; (4) counsel was ineffective for failing to object to the "aggravation of a felony by evidencing prejudice" jury instruction because the instruction impermissibly lowered the State's burden of proving that Roten had "evidenced" prejudice in the commission of the charged crimes; (5) Roten's right to due process was violated when the State improperly personally attacked defense counsel; (6) counsel was ineffective for failing to object to improper comments by the prosecutor. Ground Five was raised on direct appeal, and the five allegations of ineffective assistance of trial counsel were raised in Roten's rule 3.850 motion. Consequently, the grounds are exhausted for federal habeas corpus purposes.

## STANDARDS OF REVIEW

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an

"unreasonable application" of such precedent. <u>Williams v. Taylor</u>, 529 U.S. 362 (2000). Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." <u>Id.</u> <u>Breedlove v. Moore</u>, 279 F.3d 952 (11th Cir. 2002).

Ineffective Assistance of Counsel Standard

To have a facially valid claim in alleging ineffective assistance of counsel, a Petitioner must meet the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Strickland</u>'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**DISCUSSION**

Ground One

Roten alleges trial counsel was ineffective for failing to call Stephanie Query as a defense witness. He contends this witness would have testified she heard more than one shot fired in the alley behind the victims' home about 4:30 a.m. According to Roten, this testimony would contradict the State's evidence that only a single shot was fired -- the shot that penetrated the wall of the victims' house and caused the death and injuries for which Roten was charged. In his rule 3.850 motion in state court, Roten alleged counsel should have called two witnesses--Stephanie Query and Diane Clark--to support his version of events. The state trial court reasonably denied this claim, concluding Roten could not demonstrate prejudice:

> Defendant has failed to show that had these witnesses testified that there is a reasonable probability that the outcome would have been different. Defendant confessed to police that he accidentally fired the weapon that killed the one girl and injured the other two girls. *See Exhibit C at pp. 499-502*. The issue presented at trial was whether Defendant, motivated by his racial beliefs, fired the shot into the house targeting the Mance family or

– 8 –

whether the firearm discharged accidentally. Even if the witnesses testified that they heard additional shots before the single shot, this testimony may support Defendant's version of events that he fired a series of shots before the rifle misfired the fatal shot; but would not prove that Defendant did not target the victims' house with this last shot.

It is noted that counsel deposed Diane Clark on August 23, 2000 and, contrary to Defendant's allegation, Ms. Clark testified that she heard only one shot near 4:30 a.m. *See Exhibit D: Excerpt of Deposition of Diane Clark, pp. 7-8.* As Defendant has failed to demonstrate the prejudice prong, this claim is denied.

Order Denying Motion for Postconviction Relief at pp. 4-5.

The state trial court's conclusion that Roten failed to demonstrate prejudice was objectively reasonable. This Court notes that Roten has abandoned any claim that counsel should have called Diane Clark as a defense witness to testify that she heard more than one shot at 4:30 a.m. That leaves Stephanie Query as the only witness who Roten alleges his attorney should have called to testify.

Although Query's alleged testimony would have supported Roten's story that he fired the gun more than once during his second outing in the alley at 4:30 a.m., that testimony would not have changed the result of the proceeding. First, as the state trial court opined, the testimony would not prove "that Defendant did not target the victims' house with this last shot." Second, the evidence before the jury overwhelmingly established that only one shot was fired during the last shooting incident about 4:30 a.m. Several  neighbors, Aldi Sanders, Joyce Bierl, Elizabeth Mercado, and Noreen Smith told police the same thing. (Vol. 6: T 208, 240; Vol. 9: T 825, 843). Finally, contrary to Roten's statement to police during his second interview, Roten told officers during the "walk-through" of the crime scene that he had fired only a single shot when he returned to the area behind the victims' house at 4:30 a.m. (Vol. 7: T 598-599). Given the totality of the evidence, even if Ms. Query were available and been called to testify as Roten suggests, there is no reasonable likelihood that the result of the proceeding would have been different.

Ground One does not warrant habeas corpus relief.

Ground Two

Roten alleges his trial counsel was ineffective for failing to subpoena Heath Query to testify at trial. Roten alleges Query would have testified that he heard five or six shots in a row about 2:30 a.m., and at 3:30 a.m. heard two or three more shots in a row. However, Roten admits in the federal petition, as he did in the rule 3.850 motion, that trial counsel did contact Mr. Query, and "Heath [Query] told counsel he would show up but didn't." (See petition at p. 6A). The state court properly denied this claim, noting, "Defendant himself acknowledges that counsel contacted Mr. Query and that Mr. Query assured counsel that he would appear voluntarily in court. As counsel could not foresee that Mr. Heath would not do as he promised, counsel was not deficient." (Order Denying Motion for Postconviction Relief at p. 5). The court further found that Roten was unable to demonstrate prejudice, because the expected testimony that Mr. Query heard a second burst of shots at 3:30 a.m. would not reasonably have changed the result of the proceeding.

Ground two does not warrant habeas corpus relief.

Ground Three

Roten alleges his attorney was ineffective for failing to move to strike the State's allegation that Roten had committed a "Hate Crime," based on "the State's failure and inability to prove an essential element of a Hate Crime." Specifically, Roten contends the State failed to prove Roten intentionally selected the victim because of his knowledge or perception that the victim was within one of the class characteristics enumerated in the Hate Crime statute.

The state trial court rejected Roten's argument, because under state law, the prosecutor did not have to show that Roten intentionally killed anyone, or targeted specific individuals. The state trial court's order reads:

> The State did not need to show that he intentionally killed anyone; the
> State needed to prove that his act, i.e., shooting into an occupied house at

4:30 a.m. when most people are asleep, was imminently dangerous to another and evinced a depraved mind regardless of human life, that caused someone's death. See §782.04(2), Fla. Stat. Pursuant to §775.085, Fla. Stat., the State had to show that Defendant's motivation evidenced prejudice. Therefore, Defendant cannot show that counsel was deficient, and this claim is denied.

Order Denying Motion for Postconviction Relief at p. 5-6.

The Florida "Hate Crimes" statute, §775.085, Fla. Stat. (2005), provides for reclassification of offenses in which the commission of any felony or misdemeanor "evidences prejudice based on the race, color, ancestry, ethnicity, religion, sexual orientation, national origin, mental or physical disability, or advanced age of the victim." §775.085(1)(a). In addition, the statute provides that "[i]t is an essential element of this section that the record reflect that the defendant perceived, knew, or had reasonable grounds to know or perceive that the victim was within the class delineated in this section." §775.085(3).

"Giving plain meaning to the statute's text and title, the provision punishes all who 'evidence,' or demonstrate, prejudice in the commission of a crime based on an enumerated characteristic of the victim. The statute has three requirements: 1) The perpetrator must demonstrate prejudice, or bias; 2) the bias must be evidenced in the commission of a crime; and 3) the bias must be based on one or more of the enumerated characteristics of the victim." State v. Stalder, 630 So. 2d 1072, 1074 (Fla. 1994). There was abundant evidence adduced at trial that showed Roten was a white supremacist skinhead who believed the races should not mix, and who was aware that an interracial couple and mixed-race children resided at the victims' house. Accordingly, there was no basis for moving to strike the Hate Crime allegation and defense counsel cannot be ineffective for failing to do so.

Ground three does not warrant habeas corpus relief.

Ground Four

-11-

Roten contends his trial counsel was ineffective for failing to object to the "Aggravation of a Felony by Evidencing Prejudice" jury instruction, because the instruction impermissibly lowered the State's burden of proof. Specifically, Roten takes issue with the court's instruction to the jury that the State must prove that Roten "perceived, knew, or had reasonable grounds to perceive or know the race, color, ancestry or ethnicity of the occupants of a dwelling located at 5630 31st Street North, St. Petersburg, Pinellas County . . ." Roten argues that he was charged in the indictment with crimes against Ashley Mance, Aleesha Mance, and Jaileen Jones, not the "occupants of a dwelling."

The state trial court stated, in the order denying rule 3.850 relief:

> Defendant asserts that counsel should have objected to the jury instruction for section 775.085. He specifically states that by including language regarding the occupants, instead of naming the victims, the State impermissibly lowered its burden of proof.

> This claim has not [sic] merit. The State had the burden to show every element of the offense and enhancement beyond a reasonable doubt. The evidence at trial demonstrated that Defendant targeted the house's occupants in general, and not specifically any one person. It is noted that the standard jury instruction was used for §775.085. Fla. Stat. See Florida Standard Jury Instructions in Criminal Cases, 3.3(f)(4th ed.); *Exhibit C at p. 1805*. As Defendant has not shown the deficiency prong of the <u>Strickland</u> test, this claim is denied.

Order Denying Motion for Postconviction Relief at p. 6.

The state trial court's conclusion was correct. To prove ineffective assistance of counsel for failing to object to a jury instruction, the petitioner must show that the instruction was improper, that a reasonably competent attorney would have objected to the instruction, and the failure to object was prejudicial. <u>Daugherty v. Dugger</u>, 839 F.2d 1426, 1428 (11th Cir. 1988)(citing <u>Strickland</u>, 466 U.S. at 686-87). The standard jury instruction for aggravation of a felony evidencing prejudice is as follows:

If you find that (defendant) committed (crime charged) and you also find that

during the commission of the crime (defendant)

1. perceived, knew, or had reasonable grounds to perceive or know (victim's) [race] [color] [ancestry] [ethnicity] [religion] [sexual orientation] [national origin], and

2. intentionally selected (victim) because of that perception or knowledge, you should find the defendant guilty of (crime charged) evidencing prejudice.

If you find that the defendant committed (crime charged) but did so without evidencing prejudice, then you should find the defendant guilty only of (crime charged).

Florida Standard Jury Instructions in Criminal Cases §3.3(f)(1991). The state trial court properly concluded that under state law, there is no requirement that the victim be specifically named in the jury instruction.

Moreover, there was no lessening of the State's burden of proof. See Reeves v. State, 631 So. 2d 374, 375 (Fla. 1st DCA 1994) (affirming conviction and reclassification for wantonly or maliciously shooting a firearm into an occupied building evidencing prejudice based on the sexual orientation of the victim). Consequently, the state trial court reasonably ruled that defense counsel was not ineffective for failing to challenge the "evidencing prejudice" jury instruction.

Ground four does not warrant habeas corpus relief.

Ground five

Roten contends he was denied due process of law when the state trial court denied the defense motion for mistrial following the prosecutor's comment during closing argument that defense counsel was speaking "out of both sides of the mouth." This issue was raised on direct appeal. Roten is not entitled to relief on this claim for two reasons. First, to the extent Roten now presents a claim of federal constitutional magnitude, Roten failed to

exhaust the constitutional claim in the state courts. The trial transcript reveals the following events during the State's closing argument:

>    MR. LOUGHERY [Prosecutor]: . . . Where does he shoot? Right underneath the window. Everybody knows the window is right in the middle of the room. So he fired right into the room. He may have fired more shots except the little girl screamed. We're not suggesting he meant to hurt anybody, we're suggesting the act he did was so dangerous that anybody with any sense would know somebody could or would be killed. That's second degree murder.

>    He suggested to you, Mr. Blankner [defense counsel] did, the defendant went out with a fully loaded clip. Well, I guess that's the statement of the defendant that he must have made in his second interview, the one that you all are supposed to believe that's where he was telling the truth. Interesting phenomenon which is this: I've been lying to you so now that you've caught me lying, now I'm telling you the truth. So I have more credibility now because I lied to you before and I admitted it.

>    Folks, he lied to you the whole time. You cannot find him guilty of the lesser included offense as they suggest unless you believe his statements. Why in the world would you do that? He's a liar. He only says what he has to say when he's caught. But he says in the second statement, the truthful statement, that he had a fully loaded clip.

>    Well, of interest, and listen to the tapes, it's going to take a while to get but now you know the whole evidence and you need to listen to the tapes. Because the first time you heard the first tape you don't know what the whole story was. Now back to it and listen to all the lies he told, how in depth they are.

>    Question by Detective Good, this is in the second interview now where they've already found the gun:

>    "QUESTION: Do you know if there's any rounds in the clip that's in the gun now?"

>    "ANSWER: There's probably about six or seven, something like that. Some of them are hollow points and some of them are regular lead core."

>    He didn't even know how many bullets were in the clip out of his own mouth. So Mr. Blankner speaks out of both sides of the mouth, one side says it's a fully loaded clip because Jessy Roten says so, but Jessy Roten says there were six or seven left. So let's see. If there's 30 in that clip that means he fired 23 rounds --

>    MR. BLANKNER: Your Honor, can we approach the bench? I apologize too because I don't like doing this either.

>    THE COURT: Yes.

(Thereupon, a sidebar conference was held outside the presence of the jury as follows:)

MR. BLANKNER: I believe the prosecution said to the jury that I, Mr. Blankner, spoke out of both sides of my mouth. Now, I let him call my client a liar and there's real good case law that you're not supposed to do that because of the flagrant nature that is, but we do know that Mr. Roten made a previous statement that was not the truth, so I let it go. But to say that I am talking out of both sides of my mouth is calling me a liar and that is as improper as it gets and I object and I move for a mistrial.

THE COURT: Well, I deny the mistrial. Mr. Loughery, just make sure you keep it under control; however, I will say that one of the things that was not objected to during your closing and was repeated over and over and over was you vouching for Mr. Roten's credibility and saying over and over and over and over what he said was the truth. So certainly this hasn't gone as far as some of that did. I am denying the mistrial. I am distracting [sic] Mr. Loughery to be cautious.

MR. LOUGHERY: Okay.

MR. BLANKNER: Is the Court going [sic] give a curative instruction?

THE COURT: What instruction did you want me to give?

MR. BLANKNER: I won't suggest one to the Court. I don't know what the Court could give that would -- I just have to ask for one.

THE COURT: If you have one to suggest I'll be happy to consider it. Thank you.

(Thereupon, the sidebar conference was concluded and the proceedings resumed in the presence of the jury as follows:) (Vol. 13: T 1755-1758).

Roten did not base his objection at trial on a denial of a constitutional due process right and did not raise a federal constitutional issue on direct appeal. Thus, this claim is unexhausted and procedurally barred. A petitioner must present his claims to the state courts before raising them in federal court. "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Accord, Rose v. Lundy, 455 U.S. 509, 518-19 (1982)("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts,

thus giving those courts the first opportunity to review all claims of constitutional error."),

and Upshaw v. Singletary, 70 F.3d 576, 578 (11th Cir. 1995)("[T]he applicant must have

fairly apprised the highest court of his state with the appropriate jurisdiction of the federal

rights which allegedly were violated."). In Duncan v. Henry, the United States Supreme

Court held that "[i]f state courts are to be given the opportunity to correct alleged violations

of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are

asserting claims under the United States Constitution. If a habeas petitioner wishes to claim

that an evidentiary ruling at a state court trial denied him the due process of law guaranteed

by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."

513 U.S. at 365. Accord, Anderson v. Harless, 459 U.S. 4 (1982).

   In this case, the prosecutor's comment referred to an inconsistency in Roten's

statement when he said that defense counsel "speaks out of both sides of the mouth." (Vol.

13: T 1756.) When viewing the prosecutor's remarks in context, it is clear that the

prosecutor was reacting to the unreasonableness of the defense's inconsistent versions

of events, and not accusing defense counsel personally of lying to the jury.

   It can be reasonably concluded that the comment did not infect the trial with

unfairness so as to make the resulting conviction a denial of due process. See Donnelly v.

DeChristoforo, 416 U.S. 637, 642 (1974); Cargill v. Turpin, 120 F.3d 1366, 1379 (11th

Cir.1997)(if reviewing court is confident that, absent improper prosecutorial remarks, jury's

decision would have been no different, proceeding cannot be said to have been

fundamentally unfair, and habeas relief is not warranted). It is not enough that a

prosecutor's comments were undesirable or even universally condemned. Cobb v.

Wainwright, 609 F. 2d 754 (5th Cir. 1980). Prosecutorial misconduct warrants habeas relief

only where it "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). In making this

assessment, the reviewing court must consider the allegedly improper comments in the

context of both the prosecutor's entire closing argument and the trial as a whole. Branch v. Estelle, 631 F. 2d 1229, 1233 (5th Cir. 1980). Among the considerations is the strength of the evidence, which in this case was very strong against Roten. Cobb v. Wainwright, 609 F. 2d at 756 (5th Cir.), cert. denied, 447 U.S. 907 (1980). In this case, Roten cannot establish that the prosecutor's remark, even if improper, resulted in a denial of due process.

Ground five does not warrant habeas corpus relief.

Ground Six

Roten complains his attorney was ineffective for failing to object to improper comments by the prosecutor during closing argument. Specifically, Roten takes issue with the prosecutor's remarks regarding the weakness of Roten's defense theory that the gun discharged by accident. Among the remarks that Roten alleges are improper are the prosecutor's characterization of Roten's "accidental" discharge defense as "ridiculous," "absurd," and "laughable." (Vol. 13: T 1763, 1784) The state trial court reasonably rejected this claim, finding that the prosecutor's remarks were permissible because they were invited by the defense. The court stated in its order denying relief:

> . . . Defense counsel criticized the State's firearm expert for failing to adequately investigate Defendant's claim of how he handled the firearm and that the defense's firearm experts determined that the rifle would discharge if held as Defendant described. *See Exhibit C at pp. 1737-1738.* As the State was merely countering the defense's argument, the State's comments were an "invited response." See Rivera v. State, 840 So. 2d 284, 288 (Fla. 5th DCA 2003). The State explained the shortcomings of the accidental discharge defense. *See Exhibit C at pp. 1762-1764.* This claim is denied.

Order Denying Motion for Postconviction Relief at p. 8.

"The prosecutor['s] comments must be evaluated in light of the defense argument that preceded it." Darden v. Wainwright, 477 U.S. 168, 179 (1986). In this case, the record shows that the prosecutor was rebutting defense counsel's argument that the rifle fired accidentally as Roten was folding the stock with his chin.  The prosecutor's comments were "invited by" and "responsive to" the closing argument of the defense. Id. at 182.  Given Roten's knowledge of his weapon, and the physical awkwardness of folding the stock in

-17-

such a manner, as well as the trajectory of the bullet, the prosecutor argued that the accidental shooting defense was simply not credible in light of the evidence before the jury. (Vol. 13: T 1762-1764). Moreover, the comments "did not manipulate or misstate the evidence, nor did [they] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." Id.  As the Supreme Court explained in United States v. Young, 470 U.S. 1 (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. Id. at 13. In this case, even if the prosecutor's remarks were improper, they were not so egregious as to result in a denial of due process. Thus, defense counsel's failure to object to these comments did not constitute ineffectiveness.

Ground six does not warrant habeas corpus relief.

Roten has not raised any arguments in his reply or amended reply to rebut the findings above.

Accordingly, the Court orders:

That Roten's petition is denied, with prejudice.  The Clerk is directed to enter judgment against Roten and to close this case.

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v.

-18-

Estelle, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on  July 13, 2006.


SUSAN C. BUCKLEW
United States District Judge

Counsel of Record
Jessy Joe Roten